IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

FREDIA R. ALEXANDER  :

      v.  :  Civil Action No. DKC 10-3168

                               :

UNITED STATES DEPARTMENT OF
VETERANS AFFAIRS  :

## MEMORANDUM OPINION

Presently pending and ready for resolution in this Title VII employment discrimination action is a motion to dismiss or, alternatively, for summary judgment filed by Defendant U.S. Department of Veterans Affairs ("DVA"). (ECF No. 12). The issues are fully briefed, and the court now rules, no hearing being deemed necessary. *See* Local Rule 105.6. For the following reasons, Defendant's motion will be granted.

## I.  Background

### A.  Factual Background

For purposes of this decision, the following facts are either uncontroverted or stated in the light most favorable to Plaintiff.

Plaintiff Fredia R. Alexander, an African-American female, has served as Business Manager for the Managed Care Clinical Center at the DVA since November 2002. (ECF No. 12-3, Alexander Dep., at 4, 24). Her responsibilities include budgeting, managing personnel, hiring, and ensuring that the permanent care

clinics in several Maryland locations "are properly run and staffed." (*Id.* at 4). The Managed Care Clinical Center initially oversaw the Compensation and Pension ("C&P") program, which performs physical examinations of veterans requesting benefits from DVA's Veteran Benefits Administration. (ECF No. 1 ¶¶ 22-23). The C&P program is located at the DVA's Loch Raven clinic in Baltimore. (*Id.* ¶ 22). In August 2008, after April Jefferson, the prior C&P program supervisor left that position, Plaintiff assumed Jefferson's responsibilities as interim "Acting Supervisor" of the C&P program, while continuing to perform her other duties as Business Manager. (*Id.* ¶¶ 24, 26). Jefferson informed Plaintiff at the time of transition that Plaintiff should regularly monitor the file containing completed veterans' exams to ensure that the exams were released to DVA within thirty days and that the file never contained more than 200 exams. (ECF No. 12-4, Marshall Dep., at 6-7).

In late 2008, Dr. Sandra Marshall, Plaintiff's direct supervisor and Director of the Managed Care Clinical Center, and Dr. Frederick Kotler, Deputy Director of the Managed Care Clinic Center, learned that the C&P program file contained significantly more than 200 exams, causing the C&P program to

fail its performance measures. (*Id.* at 6).[1]  Dr. Kotler subsequently discussed this problem with Plaintiff, learning that the excessive file size resulted from a combination of too few staff and an increase in the number of exams performed. (*Id.*).  The Office of the Chief of Staff detailed John Tyler, a Health Systems Specialist from that office and an employee recognized as "someone who solved problems," to the Loch Raven clinic to aid Plaintiff in attempting to resolve the issue at the end of 2008.  (*Id.* at 7; ECF No. 12-3, at 8).[2]

Plaintiff alleges that the discriminatory treatment began at this time.  Initially, Plaintiff was excluded from departmental emails about improvements to the C&P program and from other decision-making efforts and "branded as the person responsible for the [program's] failure." (*Id.* ¶¶ 34, 50, 60).  Plaintiff contends that Tyler, who accused her of sabotaging the C&P program, stated that he was "going to crack the whip" and later instructed the program staff not to speak with Plaintiff by late January 2009.  (ECF No. 1 ¶¶ 37, 68; ECF No. 12-3, at 14-15).  Tyler also gave this instruction to Regina Moore, one of Plaintiff's direct reports and the employee who aided Plaintiff in preparing a required report, and asked Moore to

---

[1] Dr. Marshall is a Caucasian female, while Dr. Kotler is a Caucasian male.

[2] Tyler is a Caucasian male.

watch Plaintiff carefully and report any errors that she made in her work.  (ECF No. 1 ¶¶ 38-39, 41).  Plaintiff, however, knew how to prepare the report without Moore's assistance and was able to do so.  (ECF No. 12-3, at 12).

When the C&P program had not attained satisfactory performance measures on January 22, 2009, the Office of the Chief of Staff realigned the C&P program from the Managed Care Clinical Center to its own office.  (ECF No. 12-4, at 8; ECF No. 13 ¶ 10).  Dr. Marshall then informed Plaintiff that she would no longer serve as interim "Acting Supervisor" and allegedly instructed Plaintiff not to return to the Loch Raven clinic.  (ECF No. 12-3, at 6; ECF No. 12-4, at 9).[3]  In February 2009, Leslie Jacobs, another of Plaintiff's direct reports, was detailed to the Loch Raven clinic as the new "Acting Supervisor" of the C&P program, and Kotler and Tyler allegedly also instructed her to cease communicating with Plaintiff.  (ECF No.

---

[3] Dr. Marshall disputes that she "banned" Plaintiff from the Loch Raven clinic, asserting that she merely told Plaintiff "that the administrative staff [at the clinic] were to work directly with [Tyler]."  (ECF No. 12-4, at 9).  Dr. Marshall additionally notes that she had received complaints about Plaintiff's "professional behavior" at the clinic prior to Plaintiff's removal, although she contends that these complaints were unrelated to Plaintiff's subsequent removal as "Acting Supervisor" of the C&P program.  (*Id.* at 8-9).

1 ¶¶ 63-64).[4]   Tyler subsequently obtained the ability to appropriate certain funds related to the C&P program, allegedly causing Plaintiff to lose control of her budget.  (ECF No. 1, ¶ 48, 50).   Additionally, although Plaintiff no longer worked on the C&P program after January 2009, Dr. Marshall told Plaintiff that the project failure impacted her 2009 performance evaluation, with Plaintiff receiving an "Excellent," rather than "Outstanding" rating.  (*Id.* ¶ 72).[5]

Plaintiff maintains that the problems she faced extended beyond the C&P program.   Following a grievance that some positions, including those of the C&P staff, "did not meet the grade that they were given," the Office of Personnel Management ("OPM") began a consistency review of those positions.  (ECF No. 12-4, at 19).   A human resources specialist from OPM contacted Plaintiff as part of this process, and Plaintiff provided the specialist with the job descriptions that she requested.  (ECF No. 1 ¶¶ 42-43).   Plaintiff insists that Dr. Marshall initially

_____

[4] Although the record indicates that Jacobs began working from the Loch Raven clinic at this time, it appears that Jacobs continued reporting to and communicating with Plaintiff.  (*See, e.g.*, ECF No. 1 ¶ 65 ("Leslie Jacobs has reported directly to Plaintiff since December 2007."); ECF 12-3, at 17 ("[Leslie Jacobs] communicates with me to this day.").

[5] The declaration attached to Plaintiff's opposition characterizes this rating as "exceeding."  (ECF No. 13-3, Alexander Decl., ¶ 8).   This memorandum opinion will use these terms interchangeably.

accused her of contacting OPM to initiate this review, although both parties now agree that OPM in fact initiated contact with Plaintiff as part of a nationwide program unrelated to Plaintiff. (ECF No. 12-3, at 19-21; ECF No. 12-4, at 19-20).

**B.    Procedural Background**

Plaintiff initially sought EEO counseling on February 18, 2009, claiming that she had suffered discrimination on the basis of sex and race and had been subjected to a hostile work environment. (*Id.* ¶ 10).  She filed a formal complaint with the EEOC on or about June 1, 2009 and made similar allegations. (ECF Nos. 12-5, 12-6).  The agency considered the following issue and five instances when evaluating Plaintiff's complaint:

> "Whether [Plaintiff] was discriminated against on the bases of race (Black) and sex (Female) when she was subjected to harassment:
>
> (1) On January 22, 2009, [Plaintiff] was informed by her supervisor, Dr. Sandra Marshall, that she was banned from going to the Loch Raven Community Based Outpatient Clinic to visit her staff.
>
> (2) On January 26, 2009, [Plaintiff] was informed by her coworkers that she was under surveillance by management.
>
> (3) On or about February 6, 2009, [Plaintiff] was accused of sabotaging the compensation and pension program.
>
> (4) On March 5, 2009, Leslie Jacobs, Acting Supervisor, was instructed not to communicate with [Plaintiff].

> (5) During April 2009, [Plaintiff] was
> accused of inappropriately contacting . . .
> OPM . . . which resulted in a position
> description review."

(*Id.*).   When the EEO official charged with investigating Plaintiff's case asked Plaintiff why she believed that the above instances resulted from race- and sex-based discrimination, Plaintiff stated only "[b]ecause I'm African-American" and "because I'm female." (ECF No. 12-3, at 13-14).   The EEOC subsequently issued a report of investigation on November 9, 2009, concluding that no unlawful discrimination had occurred, and Plaintiff then requested the appointment of an EEOC Administrative Judge, who ruled against Plaintiff. (ECF No. 1 ¶ 13).   Plaintiff later requested leave to file a civil action in district court, and she filed her complaint on November 30, 2010, advancing two claims under Title VII: (1) "Sex and Race Discrimination in Terms and Conditions of Employment", and (2) "Disparate Discipline based on Sex and Race/Color Discrimination." (ECF No. 1).   Defendant filed a motion to dismiss or, alternatively, for summary judgment on April 28, 2011 (ECF No. 12), and Plaintiff opposed this motion on May 12, 2011 (ECF No. 13).   Defendant subsequently replied to Plaintiff's opposition on May 31, 2011. (ECF No. 15).

## II.  Standard of Review

Defendant  has  moved  to  dismiss  or,  alternatively,  for summary  judgment.    A  court  considers  only  the  pleadings  when deciding  a  Rule  12(b)(6)  motion.    Where,  as  here,  the  parties present  matters  outside  of  the  pleadings  and  the  court  considers those  matters,  the  motion  is  treated  as  one  for  summary judgment.  *See* Fed.R.Civ.P.  12(b);  *Gadsby by Gadsby v. Grasmick*, 109  F.3d  940,  949  (4th  Cir.  1997);  *Paukstis  v.  Kenwood  Golf  & Country  Club,  Inc.*,  241  F.Supp.2d  551,  556  (D.Md.  2003).

A  court  may  enter  summary  judgment  only  if  there  is  no genuine  issue  as  to  any  material  fact  and  the  moving  party  is entitled  to  judgment  as  a  matter  of  law.    *See*  Fed.R.Civ.P. 56(a);  *Celotex  Corp.  v.  Catrett*,  477  U.S.  317,  322  (1986); *Emmett  v.  Johnson*,  532  F.3d  291,  297  (4th  Cir.  2008).    Summary judgment  is  inappropriate  if  any  material  factual  issue  "may reasonably  be  resolved  in  favor  of  either  party."    *Anderson  v. Liberty  Lobby*,  *Inc.*,  477  U.S.  242,  250  (1986);  *JKC  Holding  Co. LLC  v.  Washington  Sports  Ventures,  Inc.*,  264  F.3d  459,  465  (4th Cir.  2001).

"A  party  opposing  a  properly  supported  motion  for  summary judgment  'may  not  rest  upon  the  mere  allegations  or  denials  of [his]  pleadings,'  but  rather  must  'set  forth  specific  facts showing  that  there  is  a  genuine  issue  for  trial.'"    *Bouchat  v. Baltimore  Ravens  Football  Club,  Inc.*,  346  F.3d  514,  522  (4th  Cir.

2003) (quoting former Fed.R.Civ.P. 56(e)).   "A mere scintilla of proof . . . will not suffice to prevent summary judgment." *Peters v. Jenney*, 327 F.3d 307, 314 (4th Cir. 2003).   "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."   *Liberty Lobby*, 477 U.S. at 249-50.   (citations omitted).   At the same time, the court must construe the facts that are presented in the light most favorable to the party opposing the motion.   *See Scott v. Harris*, 550 U.S. 372, 378 (2007); *Emmett,* 532 F.3d at 297.

## III. Analysis

Plaintiff's complaint includes two counts: (1) "Sex and Race Discrimination in Terms and Conditions of Employment," and (2) "Disparate Discipline based on Sex and Race/Color Discrimination."   Despite the apparent simplicity of these count titles, it is far from clear what actions Plaintiff contends constitute discriminatory actions and the precise nature of the claims that she intends to allege.   In its motion, Defendant construed count one as alleging disparate treatment resulting from the removal of Plaintiff's C&P program duties and count two as alleging disparate discipline stemming from the loss of these duties and Plaintiff's 2009 performance evaluation downgrade.[6]

---

[6] Defendant separately contends that the court cannot consider the allegation regarding Plaintiff's lower 2009 performance evaluation because she failed to exhaust her

Plaintiff's opposition, however, briefly sets forth factors relevant to a hostile work environment and contends that Defendant "mischaracterizes the complaint" by failing to focus on the "ongoing" discrimination that she suffered while employed as both Business Manager and interim "Acting Supervisor" of the C&P program.  (ECF No. 13-1, at 1).  In a later part of this opposition, Plaintiff asserts that she "has demonstrated a prima

---

administrative remedies by not raising that allegation during the administrative process.  It is well-established that "[b]efore filing suit under Title VII, a plaintiff must exhaust her administrative remedies by bringing a charge with the EEOC." *Smith v. First Union Nat'l Bank*, 202 F.3d 234, 247 (4th Cir. 2000).  The scope of the civil action stemming from the EEOC charge is confined to "those discrimination claims stated in the initial charge, those reasonably related to the original complaint, and those developed by reasonable investigation [of that complaint]." *Jones v. Calvert Group, Ltd.*, 551 F.3d 297, 300 (4th Cir. 2009) (quotation marks omitted).  Civil suits may not present entirely new factual bases or entirely new theories of liability not found in the initial EEOC complaint. Therefore, a plaintiff fails to exhaust her claims when "h[er] administrative charges reference different time frames, actors, and discriminatory conduct than the central factual allegations in h[er] formal suit." *Chacko v. Patuxent Inst.*, 429 F.3d 505, 506 (4th Cir. 2005).  In the present case, both the time frame and the actor responsible for providing this 2009 evaluation are unclear.  Indeed, the record contains no information indicating when Plaintiff received this evaluation or which supervisor provided her with the evaluation; rather, it indicates only that Plaintiff received a lower rating on her 2009 evaluation and that Dr. Marshall subsequently indicated to Plaintiff that the C&P program failure drove the rating reduction.  This lack of facts thus makes it unclear whether the EEO investigation of Plaintiff's complaint may have considered the evaluation or whether the evaluation would otherwise be "reasonably related" to Plaintiff's EEO complaint.  These issues, however, need not be resolved because even assuming that Plaintiff did exhaust her administrative remedies as to the 2009 performance evaluation, she cannot avoid summary judgment based on this allegation.

facie case of disparate treatment" before again focusing on the "continuous and ongoing manner" in which she allegedly experienced discrimination. (*Id.* at 4-5). She does not dispute Defendant's characterization of the second count of her complaint. Due to Plaintiff's repeated emphasis on the cumulative effect of Defendant's actions, count one of her complaint will be construed as a hostile work environment claim rather than a claim for disparate treatment based on these discrete actions. Additionally, because both Plaintiff and Defendant describe the second claim as stemming from "disparate discipline," count two will be construed as a disparate discipline claim.

In evaluating both claims, there are two overarching principles to keep in mind. First, the federal courts do "not sit as a kind of super-personnel department weighing the prudence of employment decisions made by [employers] charged with employment discrimination." *Amirmokri v. Abraham*, 437 F.Supp.2d 414, 424 (D.Md. 2006) (quoting *DeJarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir. 1998)). Second, even when the employer is a federal agency, courts have an important duty in the anti-discrimination context "not to invade the province of another in circumstances which the law does not allow." *Hux v. City of Newport News, Va.*, 451 F.3d 311, 315 (4th Cir. 2006).

**A.    Count One: Hostile Work Environment**

Title VII bars federal government employers from engaging in "any discrimination based on race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-16.[7]  Harassment based on race and sex, and leading to a hostile work environment, represents one form of this prohibited discrimination.  *See Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986); *Wang v. Metro. Life Ins. Co.*, 334 F.Supp.2d 853, 863 (D.Md. 2004). The first count of Plaintiff's complaint alleges that she was the victim of such discrimination.

Under the familiar *McDonnell Douglas* framework, Plaintiff bears the initial burden of establishing a *prima facie* case, and only if she does so will the burden shift to Defendant to proffer a legitimate, non-discriminatory reason for its actions. *Pitter v. Cmty. Imaging Partners, Inc.*, 735 F.Supp.2d 379, 390 (D.Md. 2010).  To establish a *prima facie* case of hostile work environment from racial and sexual harassment, Plaintiff must show the following four elements: (1) she was subjected to

---

[7]    "Notwithstanding the differences in wording, sections 2000e-2 [which address private sector claims] and 2000e-16 generally have been treated as comparable, with the standards governing private-sector claims applied to claims under section 2000e-16."  *Bhella v. England*, 91 F.App'x 835, 844 (4th Cir. 2004).

unwelcome conduct; (2) the unwelcome conduct was based on race and sex; (3) the conduct was sufficiently pervasive or severe to alter the conditions of employment and create a hostile work environment; and (4) some basis exists for imputing liability to the employer. *See, e.g.*, *Smith v. First Union Nat'l Bank*, 202 F.3d 234, 241-42 (4th Cir. 2000). Plaintiff wholly fails to make this showing.

As an initial matter, even if Plaintiff demonstrates that she faced unwelcome conduct, it is unlikely that she could demonstrate that this conduct occurred because of her race and sex. It is axiomatic that a plaintiff's mere speculation as to racial or gender animus will not suffice to prove that she suffered unwelcome conduct due to race and sex. *See, e.g.*, *Nicole v. Grafton Sch., Inc.*, 181 F.Supp.2d 475, 482-93 (D.Md. 2002); *Sonpon v. Grafton Sch., Inc.*, 181 F.Supp.2d 494, 500 (D.Md. 2002); *cf. Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 959 (4th Cir. 1996) (explaining that a plaintiff's "'own naked opinion, without more, is not enough to establish a prima facie case of []discrimination'" (alteration in original) (citations omitted)). Indeed, where the plaintiff sets forth no evidence of racial or sexual epithets by others, any assertion that impermissible factors drove the unwelcome conduct will likely fail. *Compare Khoury v. Meserve*, 268 F.Supp.2d 600, 612-13 (D.Md. 2003) (rejecting a gender- and national origin-based

hostile work environment claim where the plaintiff alleged only that she did not receive a workplace award given to a male colleague and that another colleague commented on her English-speaking ability because "none of the events [she] describe[d] . . . explicitly refer[red] to [her] gender or national origin"), *with EEOC v. Cent. Wholesalers, Inc.*, 573 F.3d 167, 175-79 (4th Cir. 2009) (finding that an employer's use of racial and gender epithets demonstrated that the alleged unwelcome conduct was based on race and sex).

Here, Plaintiff's contention that she faced harassment due to race and sex is factually analogous to the situation in *Khoury*. First, she presents no derogatory statement from her supervisors or any other employee with whom she worked regarding her race or sex. In fact, the only statements in the record even mentioning Plaintiff's race and sex come from Plaintiff herself – when she asserted during her deposition with the EEO investigator that she faced harassment "because [she was] African-American" and "because [she was] female." (ECF No. 12-3, at 13-14). Such speculation by Plaintiff, however, simply will not suffice to demonstrate that she experienced racial or sexual harassment; concrete facts demonstrating racial and gender animus are required. To the extent Plaintiff intends to allege that Defendant's interference with her role as Business Manager and "Acting Supervisor" of the C&P program demonstrates

harassment based on race or sex, such an argument is "circumstantial at best." *Khoury*, 268 F.Supp.2d at 613.   Given Plaintiff's acknowledgement that the C&P program she supervised was consistently failing to meet its performance measures, "[t]his circumstantial evidence . . . is insufficient to support a reasonable inference that, but for Plaintiff's membership in a protected class, she would not have [faced] the entire pattern of treatment she claims constituted a hostile work environment." *Id.; see also Daso v. Grafton Sch., Inc.*, 181 F.Supp.2d 485, 492-93 (D.Md. 2002) (rejecting a plaintiff's circumstantial evidence of racial harassment stemming from his repeated placement on probation where the plaintiff "admitted to the truth of the circumstances stated by [the employer]" as the reasons for those probations).

Even if Plaintiff could demonstrate that the unwelcome conduct occurred because of her race and sex, her hostile work environment claim would fail because she cannot demonstrate that the conduct was sufficiently severe or pervasive to alter the conditions of her employment. *See Cent. Wholesalers*, 573 F.3d at 175; *Thorn v. Sebelius*, 766 F.Supp.2d 585, 601 & n.19 (D.Md. 2011).   Plaintiff's complaint suggests that eight separate instances allegedly combined to create a hostile work environment: (1) exclusion from emails and decision-making; (2) loss of control over her budget when Tyler obtained the ability

to appropriate certain funds related to the C&P program; (3) Tyler's instruction to Moore to watch Plaintiff and report any errors that she made; (4) Tyler's instruction to the C&P program staff not to communicate with Plaintiff; (5) blame Plaintiff believes she absorbed for the C&P program failure; (6) animosity Plaintiff experienced from her staff following Dr. Marshall's accusation that Plaintiff initiated the OPM consistency review; (7) Dr. Marshall's alleged instruction to Plaintiff to abstain from visiting the Loch Raven clinic; and (8) Plaintiff's removal as interim "Acting Supervisor" for the C&P program.[8]

While hostile work environment claims generally involve the cumulative effect of discrete acts that may not be individually actionable, the harassing actions must nonetheless combine to permeate the workplace with "discriminatory intimidation, ridicule, and insult" in order for a plaintiff to succeed in presenting a *prima facie* case. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002). The United States Court of Appeals for the Fourth Circuit has explained this standard as follows:

---

[8] Plaintiff does not contend that her reduced rating of "excellent" or "exceeding" in 2009 constituted a continuation of the hostile work environment. Indeed, in her opposition, she explains that it was the actions cited above that "unreasonably interfered with her ability to perform" and that this interference merely manifested itself in her lower performance evaluation. (ECF No. 13-1, at 5).

> Title VII does not establish a general
> civility code for the American workplace.
> This is because, in order to be actionable,
> the harassing conduct must be [so] extreme
> [as] to amount to a change in the terms and
> conditions of employment. . . . Our circuit
> has likewise recognized that plaintiffs must
> clear a high bar in order to satisfy the
> severe or pervasive test.  Workplaces are
> not always harmonious locales, and even
> incidents that would objectively give rise
> to bruised or wounded feelings will not on
> that account satisfy the severe or pervasive
> standard.  Some rolling with the punches is
> a fact of workplace life.  Thus, complaints
> premised on nothing more than rude treatment
> by [coworkers], callous behavior by [one's]
> superiors, or a routine difference of
> opinion and personality conflict with
> [one's] supervisor, are not actionable under
> Title VII.

*EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315-16 (4th Cir.

2008) (internal quotation marks and citations omitted); *see also*

*Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998) (noting

that "[d]iscourtesy or rudeness should not be confused with . .

. harassment (internal quotation marks and citations omitted)).

Plaintiff fails to meet this standard.  The record is

devoid of any evidence of intimidation, ridicule, or insults

that Plaintiff suffered.  At most, the instances cited above

indicate a combination of disagreement between Plaintiff and her

co-workers regarding the failure of the C&P program and a

potentially rude reaction from these co-workers in response to

that disagreement.  Federal court, however, is not the

appropriate forum to resolve such disputes.  *Amirmokri*, 437

F.Supp.2d at 424; *see also Thorn*, 766 F.Supp.2d at 600-01 (using similar reasoning to reject a hostile work environment claim stemming from a plaintiff's loss of management duties, numerous reprimands, and marginalization due to his exclusion from a project team and his supervisor's instruction to another employee to refrain from working with him).   Plaintiff fails to present a *prima facie* case for racial and sexual harassment due to hostile work environment.

**B.   Count Two: Disparate Discipline**

The second count of Plaintiff's complaint alleges that Defendant subjected Plaintiff to "disparate discipline" based on race and gender following the C&P program's failure to meet its performance measures.   To establish a *prima facie* case for disparate discipline, Plaintiff must set forth three elements: (1) she is a member of a protected class; (2) the prohibited conduct in which she engaged was comparable in seriousness to that of employees outside the protected class; and (3) the disciplinary action taken against her was more severe than the action taken against other employees.   *Cook v. CSX Transp. Corp.*, 988 F.2d 507, 511 (4th Cir. 1993).   Defendant contends that Plaintiff cannot set forth a *prima facie* case as to this claim, and Plaintiff does not dispute this contention.

Ultimately, while Plaintiff qualifies as a member of a protected class due to her race and gender, her disparate

discipline claim must fail because the record fails to set forth any prohibited conduct for which she was disciplined.   The disparate discipline framework generally applies to situations in which employees have faced discipline after engaging in workplace misconduct, such as violations of policies and rules, or criminal activity.   *See, e.g.*, *Cook*, 988 F.2d at 511-12 (considering a disparate discipline claim where an employer had dismissed an employee after five violations of corporate policy); *Jenks v. City of Greensboro*, 495 F.Supp.2d 524, 530 (M.D.N.C. 2007) (applying disparate discipline framework following a police officer's assault of a civilian); *Manning v. Foodarama, Inc.*, 195 F.Supp.2d 741, 744 (D.Md. 2002) (analyzing a disparate discipline claim stemming from a physical fight between employees).   Indeed, it appears that no court in the Fourth Circuit has applied this framework to a claim stemming solely from an employee's underperformance in the workplace. *See Abrams v. Wachovia Corp.*, No. 3:08-4073-JFA-PJG, 2010 WL 2622437, at *6 (D.S.C. June 25, 2010) (rejecting a disparate discipline claim where the facts indicated only that the plaintiff "underperformed, he did not misconduct himself").

Here, Plaintiff bases her disparate discipline claim on allegedly discriminatory treatment that stemmed from her supervision of the failing C&P program. (*See* ECF No. 1 § 54 ("Plaintiff was discriminated against when she was . . . .

disparately disciplined for the failure of the C&P program."). Inadequate supervision of the failing program on its own, however, cannot serve as the basis of a disparate discipline claim because it involves neither workplace misconduct nor criminal activity – the forms of prohibited conduct on which 10disparate discipline claims are generally based. *Cf. Abrams*, 2010 WL 2622437, at *6.[9]  Accordingly, Plaintiff's disparate discipline claim cannot proceed.[10]

---

[9] Although not emphasized in the cause of action alleging disparate discipline, there is one other circumstance set forth in Plaintiff's complaint that could constitute "prohibited conduct" and give rise to a disparate discipline claim:  the allegation that Plaintiff "inappropriately contact[ed] OPM" and initiated a position review (ECF No. 12-3, at 19).  The parties now agree that Plaintiff did not initiate the review, but Plaintiff asserted in her deposition that Dr. Marshall believed that she had done so.  Even if Dr. Marshall did believe that Plaintiff had "inappropriately" initiated the review, Plaintiff would be unable to set forth a *prima facie* case for disparate discipline based on that purported misconduct because Plaintiff failed to allege that she suffered discipline of any kind as a result.  Indeed, when asked about this issue during the EEO investigation, Plaintiff acknowledged that Dr. Marshall had taken no action against her based on the erroneous belief that Plaintiff had initiated the position review.

[10] As noted at the outset of this opinion, Plaintiff does not appear to allege discrimination in the form of a traditional disparate treatment claim, and instead asserts claims based on hostile work environment and disparate discipline.  To the extent that Plaintiff did intend to allege a traditional disparate treatment claim, it too would fail.  The elements of a *prima facie* case of disparate treatment are as follows: "(1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class." *Coleman v. Md. Court of Appeals*, 626 F.3d

### C.    Plaintiff's Rule 56(d) Request

In a final attempt to avoid summary judgment, Plaintiff contends that summary judgment at this stage is premature because she has not had the opportunity to "obtain necessary discovery of information possessed by her opponent." (ECF No. 13-1, at 3). As a general matter, "summary judgment [must] be refused where the nonmoving party has not had the opportunity to discover information that is essential to the motion." *Anderson*, 477 U.S. at 250 n.5. To render this general rule

---

187, 190 (4th Cir. 2010), *cert. granted on other grounds*, 131 S.Ct. 3059 (June 27, 2011) (No. 10-1016). Plaintiff here cannot satisfy the third or fourth elements. As an initial matter, it is unlikely that any of the actions she challenges, which include the eight instances listed in her hostile work environment claim along with her reduced performance evaluation, qualify as adverse employment actions. The majority of these actions merely constitute "minor slights and grievances" that courts have long refused to classify as adverse actions. *See Bonds v. Leavitt*, 647 F.Supp.2d 541, 547, 556-57 (D.Md. 2009) (internal quotation marks omitted) (refusing to consider as adverse actions inability to attend meetings or close one's office door), *overruled on other grounds by* 629 F.3d 369 (4th Cir. 2011); *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 377 (4th Cir. 2004) (internal quotation marks omitted) ("[A] poor performance evaluation is actionable only where the employer subsequently uses the evaluation as a basis to detrimentally alter the terms or conditions of the recipient's employment."). Assuming *arguendo* that Plaintiff's removal as interim "Acting Supervisor" did constitute adverse employment action, which is not at all certain given the part-time, interim nature of that position, Plaintiff is unable to establish the final element of a *prima facie* case because Dr. Kotler and Dr. Marshall, a Caucasian male and Caucasian female, respectively, also lost their supervisory positions when the C&P program was transferred from the Managed Care Clinical Center.

applicable, however, the nonmovant must clearly demonstrate the need for discovery pursuant to Rule 56(d), which allows a court to deny summary judgment or delay ruling on the motion until discovery has occurred if the "nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition." Fed.R.Civ.P. 56(d).[11]

"The Fourth Circuit has strictly interpreted the requirements of Rule 56[(d)]," previously holding that "the failure to file an affidavit under Rule 56[(d)] is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate." *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (internal quotation marks and citations omitted); *Amirmokri*, 437 F.Supp.2d at 420. And although courts have relaxed the affidavit requirement if the nonmoving party's objection "served as the functional equivalent of an affidavit" or if the nonmoving party diligently pursued discovery, they have done so only where the discovery sought would create a genuine dispute of material fact. *Harrods Ltd.*, 302 F.3d at 244-45; *Strag v. Bd. of Trs.*, 55 F.3d 943, 954 (4th Cir. 1995). Here, Plaintiff's Rule 56(d)

---

[11] In an apparent procedural oversight, Plaintiff makes no reference to Rule 56(d) in setting forth this argument, instead repeatedly referencing Rule 56(f). The 2009 Amendments to the Federal Rules of Civil Procedure transferred the language of former Rule 56(f) to Rule 56(d).

request fails at the first step.  Although her memorandum in opposition to Defendant's pending motion references an affidavit explaining that "discovery is the only method through which Plaintiff's claims can be proved," Plaintiff attached no such affidavit to that memorandum.  (ECF No. 13-1, at 9).

Even setting aside this significant procedural error and assuming that Plaintiff could satisfy one of the two limited exceptions to the affidavit requirement, Plaintiff cannot demonstrate that discovery would enable her to create a genuine issue of material fact.  Plaintiff states that discovery would enable her to depose other business managers "regarding the oversight over their direct reports and budget, as well [as] Dr. Sandra Marshall regarding her reasons for denying Plaintiff's ability to approve her direct reports' [time and leave], view their grade and step, and for taking on responsibilities belonging to [Plaintiff]."  (*Id.*).  First, as previously explained, further investigation of Plaintiff's budget allegation would create no material factual dispute because that allegation demonstrates neither unwelcome conduct sufficient to create a hostile work environment nor misconduct sufficient to support a disparate discipline claim.  Second, Plaintiff alleges for the first time in her opposition that Dr. Marshall took away job responsibilities, such as interaction with direct reports, which belonged to Plaintiff.  It is well-established that a

plaintiff may not amend her complaint through argument in a brief opposing summary judgment, *Sensormatic Sec. Corp. v. Sensormatic Elecs. Corp.*, 455 F.Supp.2d 399, 436 (D.Md. 2006) (citing *Shanahan v. City of Chicago*, 82 F.3d 776, 781 (7th Cir. 1996)), which is precisely the result that would obtain if the court permitted Plaintiff to take discovery of this newly raised issue.  Plaintiff thus cannot sustain her case by invoking the protections of Rule 56(d).

## IV. Conclusion

For the foregoing reasons, Defendant's motion for summary judgment will be granted.  A separate Order will follow.

<u>           /s/                     </u>
DEBORAH K. CHASANOW
United States District Judge